United States District Court
Southern District of Texas
**ENTERED**
October 01, 2018
David J. Bradley, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| HUBERT RANDLE, | § | |
| on behalf of himself, individually, | § | |
| and ALL OTHERS SIMILARLY | § | |
| SITUATED | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-18-1770 |
| | § | |
| METROPOLITAN TRANSIT | § | |
| AUTHORITY OF HARRIS COUNTY, | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND OPINION**

This suit alleges a failure to pay overtime as required under the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201 *et seq.* Hubert Randle, a public-transportation driver in Houston, Texas, sued the Metropolitan Transit Authority of Harris County ("Metro"), asserting a right to relief for himself and on behalf of other similarly situated employees. (Docket Entry No. 61). Randle, who drove a van for METROLift, which serves elderly and disabled passengers, claims that Metro mischaracterized METROLift drivers as independent contractors rather than as employees to avoid overtime payments under the FLSA. (*Id.* at ¶ 1). Metro moves to dismiss and to compel arbitration under arbitration clauses contained in agreements between Randle and the Greater Houston Transportation Company and Yellow Cab Paratransit Services, Inc. (Docket Entry No. 74). Based on a careful review of the pleadings; the motions; response and reply; counsels' arguments; and the applicable law, this court grants Metro's motion to dismiss and to compel arbitration. The reasons for the ruling are stated in detail below.

## I.      Background

Metro is a public transportation service operating in Harris County, Texas.  Its services include METROLift, which offers free or subsidized transportation to disabled and elderly residents.

Metro turned to private companies to provide drivers for METROLift.  An agreement between Metro and the Greater Houston Transportation Company ("GHTC") permitted GHTC and its sister companies, Yellow Cab Paratransit Services and Texas Paratransit, Inc. (together, "Yellow Cab"), to enter into subcontractor agreements for METROLift services.  (Docket Entry No. 74-2 at 2–3, 7).  Yellow Cab entered into individual agreements with each driver, under which the drivers would pay Yellow Cab a service fee in exchange for the right to drive METROLift routes.  (*Id.* at 3).  Yellow Cab would also provide the drivers support services and equipment.  (*Id.*).

The parties' filings show that on April 7, 2011, Randle signed a written agreement with Yellow Cab to lease and operate a taxicab.  (Docket Entry No. 74-2 at 37).  An addendum to that agreement signed on the same day permitted Randle to lease from Yellow Cab the equipment to drive for METROLift.  (Docket Entry No. 74-2 at 51).  On April 18, 2011, Randle signed a Master Agency Agreement and an addendum with Yellow Cab to drive for METROLift under Yellow Cab's agreement with Metro.  (Docket Entry No. 74-2 at 53, 63).The parties executed other addenda to the Agreement in October 2011, August 2012, and July 2013.  (Docket Entry Nos. 74-2 at 67–75).  Yellow Cab and Randle also signed agreements extending Randle's license to lease Yellow Cab vehicles and to drive under Yellow Cab's METROLift agreement in October 2013.  (Docket Entry No. 74-2 at 79).

In April 2016, Yellow Cab and Randle signed two additional agreements that renewed Randle's right to drive under Yellow Cab's METROLift agreement with Metro.  (*Id.* at 81–88).  The

two April 2016 Yellow Cab agreements (together, the "Agreements") are at the heart of this motion to dismiss and compel arbitration.  Both Agreements contain arbitration clauses.

The first of the Agreements, the Metro Contract Designation, refers to Randle as the "Licensee" and Yellow Cab as "the Company."  The Designation includes the following arbitration clause:

> Arbitration.  Licensee and the Company agree that arbitration is the required and exclusive forum for the resolution of all disputes and claims arising out of or in any way relating to this METRO Contract Designation, whether in tort or contract or any other cause of action.  Such arbitration shall be conducted by a single arbitrator and take place in Harris County, Texas under the rules of the American Arbitration Association, unless the parties agree otherwise.  Notwithstanding anything to the contrary, Licensee and the Company may seek injunctive or equitable relief from a court of competent jurisdiction in any state or federal court in Houston, Harris County, Texas without first participating in arbitration.

(Docket Entry No. 74-2 at 84).  The Services Agreement, which refers to Randle as "Customer" and Yellow Cab as "YCP," includes a virtually identical arbitration clause:

> Arbitration.  Customer and YCP agree that arbitration is the required and exclusive forum for the resolution of all disputes and claims arising out of or in any way relating to this Services Agreement, whether in tort or any other cause of action.  Such arbitration shall be conducted by a single arbitrator and take place in Harris County, Texas under the rules of the American Arbitration Association, unless the parties agree otherwise.  Notwithstanding anything to the contrary, Licensee and the Company may seek injunctive or equitable relief from a court of competent jurisdiction in any state or federal court in Houston, Harris County, Texas without first participating in arbitration.

(Docket Entry No. 74-2 at 87).

Although Randle did not directly contract with Metro, he filed this lawsuit against Metro in May 2018, alleging that Metro misclassified him and similarly situated METROLift drivers as independent contractors and failed to pay them the overtime wages required under the FLSA. (Docket Entry No. 1).  After Randle moved for conditional collective action certification and

issuance of notice, Metro moved to dismiss and to compel arbitration based on the arbitration clauses in Randle's Agreements with Yellow Cab. (Docket Entry Nos. 20, 24). This court denied the motion for conditional certification, without prejudice, and granted Randle leave to amend to find and substitute a named plaintiff not subject to an arbitration agreement. (Docket Entry No. 58). Randle filed an amended complaint and a response opposing the motion to dismiss and to compel arbitration; the amended complaint did not name a new plaintiff. (Docket Entry Nos. 61–62). Metro filed a new motion to dismiss and to compel arbitration based on the amended complaint and replied to Randle's response. (Docket Entry Nos. 74, 79). Without the court's leave or Metro's consent, Randle responded to the new motion to dismiss and to compel arbitration after the submission period ended. (Docket Entry No. 87).[1] The new response asked that if the court granted the motion to compel arbitration, it also grant leave to substitute a new named plaintiff. (*Id.* at 27). Metro responded. (Docket Entry No. 94).

## II.    The Legal Standards

Federal policy strongly favors enforcing contractual arbitration agreements if the contracts exist under state law and the disputes are within the scope of the arbitration clause. *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 217 (1983); *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). The Federal Arbitration Act (FAA), 9 U.S.C. § 1 *et seq.*, permits a party to move to compel arbitration when an opposing party refuses to arbitrate issues covered by a valid arbitration agreement. *Am. Bankers Ins. Co. of Fla. v. Inman*, 436 F.3d 490, 493 (5th Cir.

---

[1] Local Rules 7.3–4 require responses to opposed motions within 21 days from filing of the motion. S.D. Tex. R. 7.3–4. Metro's new motion to dismiss was filed on August 27. (Docket Entry No. 74). Randle filed his response to the motion to dismiss on September 18. (Docket Entry No. 87). Although Randle's response to the renewed motion to dismiss was not filed by the required deadline, the court has taken it into account in this opinion.

2006) (quoting *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24 (1991)); 9 U.S.C. § 3, 4. A court must decide "whether the parties agreed to arbitrate the dispute in question," which requires deciding whether: "(1) there is a valid agreement to arbitrate between the parties; and (2) whether the dispute in question falls within the scope of that arbitration agreement." *Tittle v. Enron Corp.*, 463 F.3d 410, 418 (5th Cir. 2006) (quoting *Webb v. Investacorp, Inc.*, 89 F.3d 252, 258 (5th Cir. 1996)).  State contract law governs the validity and scope of an agreement.  *Morrison v. Amway Corp.*, 517 F.3d 248, 254 (5th Cir. 2008).  If there is an enforceable agreement to arbitrate the dispute, the court must determine whether any federal statute or policy makes the claims nonarbitrable. *JP Morgan Chase & Co. v. Conegie ex rel. Lee*, 492 F.3d 596, 598 (5th Cir. 2007). Because of the strong presumption in favor of arbitration, "a party seeking to invalidate an arbitration agreement bears the burden of establishing its invalidity." *Carter v. Countrywide Credit Indus., Inc.*, 362 F.3d 294, 297 (5th Cir. 2004).  The FAA requires district courts to order arbitration of all arbitrable claims.  *Sedco, Inc. v. Petroleos Mexicanos Mexican Nat'l Oil Co.* (*In re Sedeco, Inc.*), 767 F.2d 1140, 1147 (5th Cir. 1985).  District courts should dismiss rather than stay litigation pending arbitration if all issues must be resolved by arbitration.  *Alford v. Dean Witter Reynolds, Inc.*, 975 F.2d 1161, 1164 (5th Cir. 1991).

Despite its preference for arbitration, § 1 of the FAA contains an exception that limits the enforcement of arbitration agreements against certain workers.  Randle argues that this exception applies.  (Docket Entry No. 87 at 27).  Section 1 states that "nothing herein contained shall apply to contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce."  9 U.S.C. § 1.  This provision "exempts from the FAA only contracts of employment of transportation workers."  *Circuit City Stores, Inc. v. Adams*, 532 U.S.

105, 119 (2001).  Applying this exception requires two findings: (1) the arbitration clause is part of an employment contract, and (2) the employee challenging the arbitration clause is a transportation worker.  *See id.*  If the exception applies, then the court cannot compel Randle to arbitrate his claims.

Once a court concludes there is a valid arbitration agreement, it must then determine whether the dispute is within the scope of that agreement, following the "strong national policy favoring arbitration of disputes, and [resolving] all doubts concerning the arbitrability of claims . . . in favor of arbitration." *Wash. Mut. Fin. Grp., LLC v. Bailey*, 364 F.3d 260, 263 (5th Cir. 2004) (quotations omitted); *E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002); *Tittle*, 463 F.3d at 419.

Randle does not dispute the existence of the Agreements or that he signed them.  He argues that the Agreements do not create an obligation to arbitrate enforceable by Metro.  (Docket Entry No. 87 at 6–12).  Randle challenges Metro's right to enforce the arbitration clauses because it did not sign the Agreements containing those clauses; Yellow Cab did.  (*See id.* at 6).  Metro argues that even though it was not a signatory to Randle's Agreements with Yellow Cab that contain arbitration clauses, it is entitled to enforce those clauses against a signatory.  (Docket Entry No. 94 at 8). Randle also argues that the arbitration clauses are unconscionable because they waive his substantive rights under the FLSA.  (*Id.* at 14–22).

Courts generally cannot compel arbitration without the parties' agreement, *First Options of Chi. v. Kaplan*, 514 U.S. 938, 943 (1995), but a nonsignatory may compel arbitration against a signatory if state contract law provides a basis to do so.  *Crawford Prof'l Drugs, Inc. v. CVS Caremark Corp.*, 748 F.3d 249, 255 (5th Cir. 2014).  The usual state-law grounds for allowing a nonsignatory to enforce an arbitration agreement against a signatory include: (1) incorporation by

reference; (2) assumption; (3) agency; (4) veil-piercing or alter ego; (5) estoppel; and (6) third-party

beneficiary.  *Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 345 F.3d 347, 356 (5th Cir. 2003).

## III.    Analysis

### A.    The Applicability of the Transportation-Worker Exception

Randle's argument that he is a "transportation worker" excluded from FAA coverage is

unpersuasive.  Randle claims that he "works in the transportation industry," describing his job as

"transport[ing] disabled and elderly citizens of Harris County to and from their homes and

appointments." (Docket Entry No. 87 at 27).  He relies on the Supreme Court's initial interpretation

of the FAA's exclusionary clause in *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105 (2001), in

which the Court held that § 1 "exempts from the FAA only contracts of employment of

transportation workers." *Id.* at 119.  Because he transported people, Randle argues, he was

employed in the transportation industry and is in the narrow category of workers exempt from

compelled arbitration.  (Docket Entry No. 87 at 27).

Metro responds that Randle is not a transportation worker within the exception for two

reasons.  First, the arbitration clauses are not in contracts for employment, and the exception applies

only to "contracts for employment."  (Docket Entry No. 94 at 13–14).  Second, Randle is not a

seaman, a railroad employee, or a worker who transports goods in interstate commerce as § 1

requires.  (*Id.* at 17–18).

*Circuit City Stores* clarified that § 1 applies to a small class of workers.  *Circuit City Stores*,

532 U.S. at 110.   The Supreme Court explained that the proper interpretation of "transportation

worker" relies on § 1's residual clause.  The phrase, "any other class of workers engaged in foreign

or interstate commerce," should be understood "to give effect to the terms 'seamen' and 'railroad

employees,' and should itself be controlled and defined by reference" to those terms. *Id.* at 115. Only those "transportation workers" involved in interstate commerce fall under the § 1 exclusionary clause. *Id.* at 119.

Fifth Circuit precedent also makes the limited applicability of § 1's exclusionary clause clear. In *Rojas v. TK Communications, Inc.*, 87 F.3d 745 (5th Cir. 1996), the Fifth Circuit explained that "[t]he exclusionary clause . . . should be narrowly construed to apply to employment contracts of seamen, railroad workers, and any other class of workers actually engaged in the movement of goods in interstate commerce in the same way that seamen and railroad workers are." *Id.* at 748. The Fifth Circuit described the Supreme Court's holding in *Circuit City Stores* as "fully consistent with [the] reasoning in *Rojas*." *Brown v. Nabors Offshore Corp.*, 339 F.3d 391, 394 (5th Cir. 2003).

Under the Fifth Circuit's decisions in *Rojas* and *Brown*, Randle is not "actually engaged in the movement of goods in interstate commerce in the same way that seamen and railroad workers are." *Rojas*, 87 F.3d at 748. He cannot be excepted from the FAA on this basis. *See, e.g.*, *Calderone v. Sonic Houston JLR, LP*, No. H-15-3699, 2016 WL 738642, at *3 (S.D. Tex. Dec. 21, 2016); *Tran v. Texan Lincoln Mercury, Inc.*, No. H-07-1815, 2007 WL 2471616, at *5 (S.D. Tex. Aug. 29, 2007). The § 1 exception excludes specific workers—those in the transportation industry with a "necessary role in the free flow of goods"—for whom Congress had or was developing specific statutory dispute-resolution schemes. *Circuit City Stores*, 532 U.S. at 121. The defining quality of a § 1 "transportation worker" is moving goods through interstate commerce. *Tran*, 2007 WL 2471616, at *5. Randle's work for METROLift involves transporting passengers locally in Harris County. He does not move goods on behalf of a carrier like a railroad or a vessel like a ship. Randle cites no cases in which a court has found that a public-transportation driver qualifies as a

"transportation worker" within §1 of the FAA.   Randle's work does not qualify him as a "transportation worker" under the § 1 exception.

### B.      The Validity of the Arbitration Clauses

Because the arbitration clauses are not excluded from FAA coverage, the court must conduct the two-step analysis, first assessing whether a valid arbitration agreement exists and second whether the disputes fall within the scope of that agreement.   *Tittle*, 463 F.3d at 418.   Courts apply state contract law to these questions.   *Morrison*, 517 F.3d at 254.

### 1.      Illusory

Randle first asserts that there is no valid arbitration clause because his Agreements with Yellow Cab are "illusory."   He relies on language reserving to Yellow Cab the right to "terminate [Randle's] rights hereunder upon [Randle's] breach of (i) any of the city ordinances . . . (ii) state or federal law, (iii) this METRO Contract Designation, (iv) the Lease Agreements, or (v) the METRO Contract."   (Docket Entry No. 67-1 at 5; 87-2 at 3).   Randle argues that "[t]his language allows Yellow Cab to hold its employees to the promise to arbitrate while reserving for itself the right [to] avoid arbitration if it chooses."   (Docket Entry No. 87 at 24) (emphasis omitted).

The threshold question is whether this issue is one for this court or for the arbitrator to decide.   The Supreme Court has clarified which "gateway" challenges to arbitration are for arbitrators as opposed to courts.   *See Prima Paint Corp. v. Flood & Concklin Mfg. Co.*, 388 U.S. 395, 406 (1967).   "A challenge to the validity (rather than the existence) of the parties' contract as a whole, as opposed to a challenge to an arbitration clause within that contract, is for the arbitrator to decide."   *Coronado v. D.N. W. Houston, Inc.*, No. H-13-2179, 2015 WL 5781375, at *5 (S.D. Tex. Sept. 30, 2015) (citing *Prima Paint Corp.*, 388 U.S. at 406; *Buckeye Check Cashing, Inc. v.*

*Cardegna*, 546 U.S. 440, 445–46 (2006)).  "Only if the arbitration clause can be attacked on an independent basis can the court decide the dispute; otherwise, general attacks on the agreement are for the arbitrator."  *Will-Drill Res, Inc. v. Samson Res. Co.*, 352 F.3d 211, 218 (5th Cir. 2003).

Randle's argument appears to challenge the Agreements as a whole as illusory, not merely the arbitration clauses.  Randle cannot avoid arbitration on this basis.  *Will–Drill Res*, 353 F.3d at 218 ("[W]here parties have formed an agreement which contains an arbitration clause, any attempt to dissolve that agreement by having the entire agreement declared voidable or void is for the arbitrator.").

If Randle is challenging the arbitration clause as illusory, this argument also fails.  "Under Texas law, an arbitration clause is illusory if one party can 'avoid its promise to arbitrate by amending the provision or terminating it altogether,'"  *Carey v. 24 Hour Fitness USA, Inc.,* 669 F.3d 202, 205 (5th Cir. 2002), that is, if one party "has the power to make changes to its arbitration policy that have retroactive effect, meaning that changes to the policy would strip the right of arbitration from an employee who has already attempted to invoke it."  *Id.* at 205.  Randle cites *Carey* to argue that Yellow Cab could revoke his right to arbitration, even retroactively.  (Docket Entry No. 87 at 24–26).

In *Carey*, the Fifth Circuit refused to enforce an arbitration agreement contained in an employee handbook.  *Carey*, 669 F.3d at 204.  The handbook had a Changes-in-Terms Clause permitting the employer to "revise, delete, and add" to the handbook.  *Id.* at 206.  The court concluded that even though the Change-in-Terms Clause required notice to employees before a change in an employment policy became effective, the clause still made the arbitration agreement illusory because it would "arguably allow [the employer] to avoid its promise to arbitrate as to

10

claims that were already in progress." *Id.* at 209.  Subsequent decisions in Texas state and federal courts have clarified *Carey*.  *See, e.g.*, *Long v. BDP Int'l, Inc.*, 919 F. Supp. 2d 832, 844–45 (S.D. Tex. 2013) (clauses in employee handbook allowing the employer to unilaterally revise its terms did not make an arbitration agreement illusory); *In re 24R, Inc.*, 324 S.W.3d 564 (Tex. 2010) (a separate arbitration agreement was not illusory even though an employee manual stated that the employer could "revoke, change or supplement guidelines at any time without notice").

The illusory nature of the arbitration agreement in *Carey* derived from the broad Change-in-Terms Clause, which permitted revision to any part of the employee handbook, including the clause. In contrast, the provisions in Randle's Agreements allowing Yellow Cab to change certain of his rights under those Agreements are narrowly written.  The provisions do not refer to arbitration, are contained in different sections of the Agreements than the arbitration clauses, and do not suggest that the "rights" referenced to include his arbitration obligation.  (Docket Entry No. 87-2 at 5).  The term "Licensee's rights hereunder" refers to Randle's right to drive routes under Yellow Cab's agreement with Metro.  (*Id.* at 3, 5).  The revocation-of-rights provisions require as a condition precedent to any revocation that Randle have committed one of the listed forms of breach.  (*Id.* at 5).  Merely submitting a claim to arbitration would not trigger the provisions or provide a basis for Yellow Cab to retroactively or unilaterally amend the arbitration agreements.

Randle claims that the absence of a "survival clause" preventing Yellow Cab from unilaterally and retroactively changing the Agreements' arbitration clauses makes the clauses illusory.  (Docket Entry No. 87 at 26).  This argument also fails.  Even if the revocation-of-rights provisions would allow Yellow Cab to terminate the Agreements—a strained reading given that the clauses permit Yellow Cab to terminate its Agreements with Randle only if Randle commits specific

breaches—"[a]n arbitration clause contained within a contract survives the termination or repudiation of the contract as a whole." *Cleveland Constr., Inc. v. Levco Constr., Inc.*, 359 S.W.3d 843, 854 (Tex. App.—Houston [1st Dist.] 2012, pet dism'd).  The arbitration clauses themselves contain no statement that Yellow Cab can unilaterally alter them.  Instead, the arbitration clauses are bilateral promises to arbitrate.  (Docket Entry No. 87-1 at 4 ("Licensee and the Company agree that arbitration is the required and exclusive forum for the resolution of all disputes and claims . . . .")).  Bilateral promises are valid consideration for enforceable arbitration clauses. *See Sharpe v. AmeriPlan Corp.*, 769 F.3d 909, 918 (5th Cir. 2014) (citing *In re Palm Harbor Homes, Inc.*, 195 S.W.3d 672, 676 (Tex. 2006)).  The arbitration clauses are not illusory.

## 2.  Unconscionable

Randle argues that: (1) provisions in his Agreements with Yellow Cab conflict with the FLSA's statute of limitations; and (2) impermissibly restrict the damages available under the FLSA.  (Docket Entry No. 62 at 9, 11).  The Agreements contain the following provisions:

> **Requirement of Prompt Notification of Accounting Errors or Waiver.**  The parties agree to promptly notify the other party of any objections to debt, obligation, accounting errors or charges (collectively referred to as "debt") claimed by the other party upon discovering such claim, but under no circumstances beyond ninety (90) days from the occurrence of the event that gives rise to such claim, or objections to such accounting or any such claims are waived by the party asserting such claims.

(Docket Entry No. 62-1 at 4).  The other challenged provision appears in the "Miscellaneous Provisions" section of both Agreements.  It reads:

> Limitations of Remedy.  In the event that either party breaches this METRO Contract Designation, as a condition precedent to the recovery of damages for breach, the non-breaching party shall specify in writing the breach and related damages as soon as reasonably practicable but in no event more than ninety (90) days after the alleged breach.  The failure to so specify in a timely manner shall limit the non-breaching party to termination of this METRO Contract Designation as the sole and exclusive remedy.  The parties waive all consequential and punitive damages against the other

> for any claims which relate to or arise under this METRO Contract Designation.  In
> no event shall either party recover any damages, regardless of the basis of same,
> against the other party which exceeds an amount equal to the Lease Fee for METRO
> Compliant Goods and the METRO Insurance Compliance Fee paid by Licensee
> during the ninety (90) days period preceding the accrual of the claim.

(Docket Entry No. 74-2 at 85; Docket Entry No. 74-2 at 87–88).  Neither of the challenged clauses

appear in the arbitration clauses, but are instead in separate sections of the agreements.  (*Id.*).

Randle correctly argues that a party's agreement to arbitrate does not require that party to

"forgo the substantive rights afforded by the statute."  *Mitsubishi Motors Corp v. Soler Chrysler-*

*Plymouth, Inc.*, 473 U.S. 614, 628 (1985).  Limits in arbitration clauses on the time for an FLSA

plaintiff to file suit can "substantially limit[] an FLSA plaintiff's damages" and undermine

Congress's intent to distinguish between ordinary and willful violations.  *Mazurkiewicz v. Clayton*

*Homes, Inc*., 971 F. Supp. 2d 682, 689–90 (S.D. Tex. 2013).  Because "[a] cause of action accrues

at each regular payday immediately following the work period during which the services were

rendered for which the wage or overtime compensation is claimed," shortening the FLSA statute of

limitations reduces the damages a plaintiff may recover.  *Halferty v. Pulse Drug Co.*, 821 F.2d 261,

271 (5th Cir. 1987) (citation omitted).  "Courts have consistently interpreted the FLSA to allow

plaintiffs to recover damages for pay periods 'as far back as the statute of limitations will reach.'"

*Mazurkiewicz*, 971 F. Supp. 2d at 690 (quoting *Pruiett v. Est End Rests., LLC*, No. 3:11–00747,

2011 WL 5520969, at *5 (M.D. Tenn. Nov. 14, 2011)).  Arbitration clauses that restrict this

approach to damages are unconscionable because they undermine congressional purpose.

*Mazurkiewicz*, 971 F. Supp. 2d at 690.

The allegedly unconscionable language is not contained in the Agreements' arbitration

clauses.  Rather, the language appears in other sections that neither address arbitration nor suggest

that they modify the arbitration clause.  Because Randle's challenge is not to the arbitration clause itself, it is for the arbitrator to decide and cannot provide a basis for denying the motion to compel. *See, e.g.*, *Buckeye*, 546 U.S. at 445–46; *Prima Paint Corp.*, 388 U.S. at 406.

### 3.    Nonsignatory

Randle's final objection is that Metro, as a nonsignatory to the Agreements, cannot compel Randle or other signatories to arbitrate under those Agreements.  (Docket Entry No. 87 at 6–14). Nonsignatories may compel signatories to arbitrate under the FAA if state contract law provides a basis for them to enforce the arbitration clauses. *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631 (2009).  Texas courts distinguish between situations in which a signatory seeks to enforce arbitration against a nonsignatory and those in which a nonsignatory seeks to enforce arbitration against a signatory.  *See, e.g.*, *Wood v. PennTex Res., L.P.*, 458, F. Supp. 2d 355, 365–66 (S.D. Tex. 2006); *Bridas*, 345 F.3d at 361.  As the Fifth Circuit explained in *Bridas*, "[i]t is more foreseeable, and thus more reasonable, that a party who has actually agreed in writing to arbitrate claims with someone might be compelled to broaden the scope of his agreement to include others."  346 F.3d at 361.

Under Texas law, courts have recognized six contract and agency principles that may permit a nonsignatory to enforce an arbitration clause against a signatory: (1) incorporation by reference; (2) assumption; (3) agency; (4) veil piercing or alter ego; (5) equitable estoppel; and (6) third-party beneficiary.  *Bridas*, 345 F.3d at 356; *Jody James Farms, JV v. Altman Group, Inc.*, 547 S.W.3d 624, 633 (Tex. 2018); *In re FirstMerit Bank, N.A.*, 52 S.W.3d 749 (Tex. 2001).

Neither party disputes that Metro is a nonsignatory to the Agreements.  Metro's original and amended motions to compel arbitration suggested that it relied on equitable estoppel to enforce the

arbitration clauses against Randle, a signatory.  (Docket Entry No. 24 at 11–13; Docket Entry No. 74 at 11–13).  Metro has since clarified that it is relying on intertwined-claims estoppel.  (Docket Entry No. 79 at 7; Docket Entry No. 94 at 8).  Metro argues that Randle's Agreements with Yellow Cab were made "pursuant to the METROLift contract," (Docket Entry No. 79 at 8; Docket Entry No. 94 at 10), and that he is relying on the benefits both provide.  (*Id.*).  Because those Agreements "expressly refer to Metro [and] the METROLift contract," and the arbitration clauses require that "any matter related to [the Agreements]" be submitted to arbitration, the clauses encompass Randle's claims against Metro.  (*Id.*).

The status of intertwined-claims estoppel in Texas is unclear.  The Texas Supreme Court acknowledged this theory as a basis for a nonsignatory to enforce an arbitration clause against a signatory in *In re Merrill Lynch Co.*, 235 S.W.3d 185, 193 (Tex. 2007), and the Fifth Circuit predicted the theory's adoption in *Hays v. HCA Holdings, Inc.*, 838 F.3d 605, 612 (5th Cir. 2016).  But in *Jody James Farms, JV v. Altman Group, Inc.*, 547 S.W.3d 624 (Tex. 2018), the Texas Supreme Court did not "consider the viability of such a theory . . . because even if [Texas] were to embrace it, the [parties had] not shown its applicability" on the facts before the court.  *Id.* at 639.

Whether Texas law formally adopts intertwined-claims or not, Metro likely cannot show a sufficiently close relationship with Yellow Cab to compel arbitration on this basis.  The Texas Supreme Court's most recent discussion in *Jody James* is instructive.  *Id.*  Jody James Farms purchased crop insurance from Rain & Hail, LLC, through an independent insurance agency, the Altman Group.  *Id.* at 629.  The insurance policy included an arbitration clause stating that any dispute under the parties' agreement that could not be resolved through mediation "must be resolved

through arbitration." *Id.* at 629.   The clause referred only to the insurer, Rain & Hail, and the insured, Jody James. *Id.*   The Altman Group was neither named in the policy nor signed the agreement containing the arbitration clause.   *Id.*   James sued the Altman Group for breach of fiduciary duty and deceptive trade practices after Rain & Hail denied coverage and prevailed in arbitration against him.   *Id.* at 630.   The Altman Group moved to compel arbitration under the insurance policy, and the trial court granted the motion.   *Id.*   After losing in arbitration to the Altman Group, James moved to vacate the award, but the state trial court confirmed it.   *Id.*   On appeal, the Texas Supreme Court concluded that the Altman Group, a nonsignatory, could not enforce the insurance policy's arbitration clause against a signatory, James.   *Id.* at 640.   Although the Court did not adopt intertwined-claims estoppel, it carefully analyzed whether the Altman Group could compel James to arbitrate on that basis.   *Id.* at 639.   The Court identified two requirements: the nonsignatory must show a "close relationship" with a signatory to the contract containing the arbitration agreement; and the claims must be "intimately founded in and intertwined with the underlying contract obligations."   *Id.* (quoting *Thomson–CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773, 779 (2d Cir. 1995)).   A central issue is whether the "relationship between the parties . . . developed in a manner that makes it 'unfair' *not* to compel arbitration."   *Id.* (quoting *Sockol Holdings, Inc. v. BMB Munai, Inc.*, 542 F.3d 354, 358, 361 (2d. Cir. 2008)).   The Court concluded that the relationship between the Altman Group and Rain & Hail was not close enough to use intertwined-claims estoppel.   Because the two companies had a relationship "no closer than that of any other independent broker or salesman," the Altman Group could not rely on Rain & Hail's contract with James to compel James to arbitrate.   *Id.* at 640.   "A reasonable consumer would not anticipate being

16

forced to litigate complaints against an independent insurance agent in the same manner they agreed to litigate disputes with the insurer." *Id.*

The relationship between Metro and Yellow Cab does not appear sufficiently "close" under *Jody James*.  The Second Circuit cases on which the court in *Jody James* relied found sufficiently close relationships primarily based on formal corporate affiliation.  *Jody James*, 547 S.W.3d at 640 (citing *Sokol Holdings*, 542 F.3d at 361).  Metro concedes that "Yellow Cab was an independent contractor to Metro," (Docket Entry No. 74-2 at 6), but it points to the fact that Randle was a subcontractor under Yellow Cab's contract with Metro.  (Docket Entry No. 74 at 12).  Under Texas law, a subcontractor relationship is insufficient.  *See In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 740 (Tex. 2005) ("The work to be performed under a second-tier subcontract will inherently be related to and, to a certain extent, defined by contracts higher in the chain.  If this were a sufficient basis for binding a non-signatory subcontractor, arbitration agreements would become easier to enforce than other contracts, counter to the FAA's purpose.").

Randle's own filings have at times suggested that he views the relationship between Yellow Cab and Metro as close.  Randle's Amended Complaint deletes his earlier assertion that "Metro began a joint employment relationship with Yellow Cab" under the METRO agreement.  (Docket Entry No. 1 at ¶ 13).  Randle also moved for a preliminary and permanent injunction against Yellow Cab, even though it is not a party; Randle's motion asserted that Yellow Cab had violated his rights under the FLSA, alleging an adverse employment action by Yellow Cab after Randle engaged in "activity protected under the FLSA." (Docket Entry No. 60 at 15 (citing *Casey v. Livingston Parish Commcn's. Dist.*, No. 07-30990, 2009 WL 577756, at *5 (5th Cir. Mar. 6, 2009)).  The court denied the motion for the injunction naming Yellow Cab.  (Docket Entry No. 83).  However, Metro has

failed to show that its relationship with Yellow Cab fits within, or is analogous to, the relationships

that Texas law recognizes as "sufficiently close to allow the application of intertwined-claims

estoppel." *Santos v. Wincor Nixdorf, Inc.*, No. 1:16-cv-440 RP, 2016 WL 4435271, at *5 (W.D.

Tex. Aug. 19, 2016). As *In re Merrill Lynch* explained, those relationships typically include a

nonsignatory owner, agent, or parent of a signatory company. 235 S.W.3d at 194. Metro has none

of these relationships with Yellow Cab.

Both steps of the intertwined-claims estoppel analysis must be met for the theory to apply.

*See Jody James*, 547 S.W.3d at 640. Because Metro has not shown a sufficiently close relationship

to support intertwined-claims estoppel, that theory does not permit Metro to compel Randle to

arbitrate.

Metro raises another estoppel theory to seek enforcement of the Agreements' arbitration

clauses. Metro argues that because Randle claims employment by Metro, his FLSA claims "now

depend[] entirely on the existence of the [Yellow Cab A]greements that contain promises to

arbitrate." (Docket Entry No. 79 at 13). Metro argues that because Randle could not have worked

in the METROLift program "[b]ut for those [A]greements," his "claims are premised on him being

incorrectly classified pursuant to the terms of those Agreements." (*Id.*).

Under Texas law, direct-benefits estoppel generally requires that a signatory arbitrate claims

that derive from that party's contract containing an arbitration clause. *In re Vesta Ins. Group, Inc.*,

192 S.W.3d 759, 761 (Tex. 2006) (per curiam). A party cannot both "knowingly exploit[] the

agreement containing the arbitration clause" and avoid the arbitration clause's requirements. *Bridas*,

345 F.3d at 362 (quoting *E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin*

*Intermediates, S.A.S.*, 269 F.3d 187, 199 (3d Cir. 2001)) (quotation marks omitted). If liability on

a claim derives from statutory or general obligations imposed by law, however, direct-benefits estoppel does not require the signatory to arbitrate that claim. *Id.*; *Cooper Indus., LLC v. Pepsi-Cola Metro. Bottling Co., Inc.*, 475 S.W.3d 436, 442 (Tex. App.—Houston [14th Dist.] 2015, no pet.). In analyzing direct-benefits estoppel, "[t]he keys are whether the nonsignatory demanded and received substantial and direct benefits under the contract containing the arbitration clause, by suing the signatory under that contract or otherwise; the relationship between the claims to be arbitrated and the contract; and whether equity prevents the nonsignatory from avoiding the arbitration clause that was part of that contract." *Wood*, 458 F. Supp. 2d at 371. When as here, the party opposing enforcement of an arbitration clause is a signatory, the same analysis applies. *See, e.g.*, *id.* at 370; *see also Meyer v. WMCO-GP, LLC*, 211 S.W.3d 302, 305 (Tex. 2006) ("[S]ometimes a person who is not a party to the agreement can compel arbitration with one who is, and vice versa.").

Randle received direct benefits from the Yellow Cab Agreements. Those Agreements provided him with a METROLift route, insurance that qualified him to drive for the METROLift service, and METROLift-complaint equipment.[2] (Docket Entry No. 62-1 at 3). Randle asserts that his claims do not arise from the Agreements, but under the FLSA. (*See* Docket Entry No. 61). While Randle's amended complaint makes no reference to the Yellow Cab Agreements, to prove his claims against Metro or Yellow Cab under the FLSA, Randle must rely on those Agreements.

In *Rachal v. Reitz*, 403 S.W.3d 840 (Tex. 2013), the Texas Supreme Court concluded that a trust beneficiary's suit to remove a trustee was subject to arbitration even though the beneficiary was not a signatory to the trust agreement containing the arbitration clause. *Id.* at 847–48. The court explained that "a beneficiary who attempts to enforce rights that would not exist without the

---

[2] Randle's other agreements with Yellow Cab provided him with a METROLift-compliant vehicle. (*See* Docket Entry No. 74-2 at 37).

trust manifests her assent to the trust's arbitration clause." *Id.* at 847.  Although the beneficiary's complaint made no contract claim, her suit depended on proving violations of the trust.  *Id.* at 847–48.

The facts here are similar.  Randle alleges that Metro was his employer that misclassified him as an independent contractor to avoid paying him overtime wages due under the FLSA. (Docket Entry No. 61).  To prove that he is a Metro employee with the right to overtime payments from Metro, Randle must rely on his Agreements with Yellow Cab.  As Randle's reply to the motion to dismiss and compel arbitration acknowledges, he "was assigned to work for Metro by Yellow Cab." (Docket Entry No. 87 at 4).  The services that Randle claims to have provided Metro are defined under his Agreements with Yellow Cab and its Contract with Metro.  (*Compare* Docket Entry No. 61 at ¶ 14 ("The drivers are given a schedule of days to work.  They are given a set route to drive. They are also given vehicles to drive.") *with* Docket Entry No. 74-2 at 82 ("Subject to the needs of METRO pursuant to the METRO Contract, [Yellow Cab] offers to [Randle] . . . the following routes of transportation services needs under the METRO Contract.")).  His rights to work in the METROLift program are defined through his Yellow Cab Agreements and the incorporation of the METRO Contract into those Agreements.  (Docket Entry No. 74-2 at 81, 86).

Other courts have concluded that direct-benefits estoppel can permit a nonsignatory defendant to enforce an arbitration agreement against a signatory plaintiff bringing an FLSA claim. Because the FLSA is not "a statute that entitle[s] employees to additional compensation regardless of whether the employees have a contract with their employer, and regardless of the contract's terms," a plaintiff making an FLSA claim must invariably rely on any employment agreements that exist. *Pollard v. ETS PC, Inc.*, 186 F. Supp. 3d 1166, 1175 (D. Colo. 2016) ("[A]n arbitrator will

need to examine and interpret the . . . Agreements to determine whether Plaintiffs' claims implicate or are affected by those Agreements.  Thus, Plaintiffs' FLSA claims are intertwined with their employment agreements.") (citations omitted)).  Any adjudicator, whether court or arbitrator, will have to interpret Randle's Agreements with Yellow Cab to assess Metro's obligations as an alleged employer.  *See id.*

Given Randle's necessary reliance on his Agreements with Yellow Cab and its incorporated contracts with Yellow Cab, Metro can compel arbitration of his FLSA under the direct-benefits estoppel theory.

### C.    The Scope of the Arbitration Agreement

The next issue is whether Randle's claims are within the scope of the arbitration clauses. Courts interpret arbitration clauses requiring arbitration of disputes "arising out of" a contract more narrowly than those requiring arbitration of disputes "related to" or "connected to" the contract. *Pennzoil Expl. & Prod. Co. v. Ramco Energy Ltd.*, 139 F.3d 1061, 1067 (5th Cir. 1998).  "Broad arbitration clauses . . . are not limited to claims that literally 'arise under the contract,' but rather embrace all disputes between the parties having a significant relationship to the contract regardless of the label attached to the dispute." *Id.*

The arbitration clauses here are broad.  They require arbitration of any claims and disputes "arising out of or in any way relating to" the Agreements.  Randle's FLSA claims are related to and arise out of the Agreements.  Randle's claims require showing an employer-employee relationship with Metro, as well as his rights to payment through, and the requirements of, his work as a METROLift driver.  (*See* Docket Entry No. 61).  Because Randle's Agreements with Yellow Cab have broad arbitration clauses and his claims have a significant relationship to those Agreements,

those claims must be resolved in arbitration.  *Pennzoil*, 139 F.3d at 1067.

### D.      Leave to Substitute a New Named Plaintiff

In Randle's response to the amended motion to dismiss and to compel arbitration, he requests that, if the court grants Metro's motion to compel arbitration, the court permit the substitution of a named plaintiff who is not subject to the Agreements' arbitration clauses.  (Docket Entry No. 87 at 27).  On August 2, the court granted Randle leave to amend to substitute a named plaintiff who is not subject to an arbitration agreement, to the extent that one exists.  (Docket Entry No. 58). Randle's amended complaint did not substitute a named plaintiff.  (Docket Entry No. 61).  Randle has already received the court's leave to substitute a named plaintiff who is not subject to arbitration agreements.  He is apparently unable to do so.  Another amendment will require a new motion and court order, granting leave.

## IV.      Conclusion

The arbitration clauses contained within Randle's Agreements with Yellow Cab are valid, and Randle's claims against Metro fall within the scope of those clauses.  Under § 3 of the FAA, "a stay is mandatory upon a showing that the opposing party has commenced suit upon any issue referable to arbitration under an agreement in writing for such arbitration."  *Alford v. Dean Witter Reynolds, Inc.,* 975 F.2d 1161, 1164 (5th Cir. 1992).  The Fifth Circuit has interpreted this language to mean that the district court cannot deny a stay when one is properly requested., not "to limit dismissal of a case in the proper circumstances."  *Id.*  If all of the issues raised before the district court are arbitrable, dismissal is appropriate.  *Id.*  Because all of Randle's claims are subject to arbitration, dismissal is proper.

Because no claims remain to be litigated, the court dismisses the action, without prejudice, in favor of arbitration.  (Docket Entry No. 74).

SIGNED on October 1, 2018, at Houston, Texas.

Lee H. Rosenthal
Chief United States District Judge